Good morning, your honors. May it please the court. My name is Amanda LaFever and I represent Officer Ray Singleton, the appellant, in his individual capacity in this appeal. For purposes of oral argument, I'd like to focus on appellant's argument with respect to the clearly established prong of the qualified immunity analysis. The appeal concerns the events that That date is incredibly important for qualified immunity purposes because that's the date that the appellee must show that the law was clearly established with respect to the tasing of an individual under the facts and circumstances present on that early morning. As the court is aware, Mr. Thompson was walking in the street with two companions, one of whom was a minor. Officer Singleton pulled up next to the three individuals to tell them to stay out of the road, recognized one of the individuals as a minor. At that point he stops, gets out of the vehicle, and orders all three individuals to go to his car and show their hands. It's undisputed that the purpose in doing that, the purpose in the officer having the three individuals collected in one location with their hands visible, is because that's a safety concern. The officer is by himself in a poorly lit area with three individuals. It's very late at night, it's a high crime area, he's got some questions he needs to ask to ascertain the situation. And appellee didn't, excuse me, appellee Mr. Thompson did not dispute that gathering and a safety concern, excuse me, for the officer. Mr. Thompson's two companions complied, went to the car, put their hands on the car, their hands were visible, and it may go without saying, but I'm going to say it anyway, which is that those two individuals, no force was used against them that morning. Unlike those two individuals, Mr. Thompson continued walking. Officer Singleton continued telling him to stop. I'm sure the court has seen the video, but it's clear from the video that Officer Singleton has to lap Mr. Thompson and get in front of him in order to get him to stop walking away from him. In that moment, on the taser video, when the video picks up, you can hear the dispatcher saying that Officer Singleton is out with a black male who is refusing to stop. So it necessarily means that the officer has already instructed Mr. Thompson to stop, he's refused to stop, and the officer has radioed that in. When I say that he lapped him, I think it's clear on the video that you can see the patrol car sort of in the shadows with the two individuals. It's the patrol car, Mr. Thompson, and the officer necessarily has the taser out and present and visible to Mr. Thompson. There's case law that the presence of the taser, or I'm sorry, the case law that I've looked at, I believe they were shooting cases where a firearm was involved, and the court has held that, you know, where feasible, a warning should be given, but that the presence of the firearm with repeated warnings does in some instances constitute the warning that the person that the firearm was pointed at. Is it, even with the video, is there a dispute, would there be a reasonable dispute as to whether he could, it was, there was a long enough pause that he could see that there was a taser aimed at him? Yes, Your Honor, I believe so. If I understand your question correctly, that there might be a question of fact about that? No, I believe Mr. Thompson has testified that he saw the taser. He was aware that the taser was out and pointed at him. Particularly, the video shows the officer get in front of Mr. Thompson, the taser's pointed at Mr. Thompson. You can see the light on Mr. Thompson's chest where the taser is pointed, and it's the we did get from Mr. Thompson, because he says, all right, okay, and he turned, and the officer is telling him to go back to his car. So no, I don't think there is an issue. So the taser came, so the taser came before he turned back to the car, and then he turns around again the second time? Yes, Your Honor, I don't think there is a dispute that Mr. Thompson was aware that the taser was out and pointed to him. It's my, it's the appellant's belief that it was the appearance of the taser, it's the recognition that the taser is pointed at him and he may get tased that caused him to actually begin complying, stop walking to his home, but the officer was not aware that that was his home when he pulled the taser out. And I think the record reflects that. Mr. Thompson? Was there any other, any, after the taser was pulled, were there any further warnings? I believe, the video, he says, walk back to my car, show me your hands, show me your hands. It sounds kind of, show me your hands, show me your hands. Mr. Thompson has his hands, as he's walking back to the patrol unit, has his hands in his pockets. The officer does say, show me your hands. Mr. Thompson, the officer says, peekaboos his hands and then immediately puts them back down at his side in his waistband or in his pockets. Walking away. Walking away, away from the officer. Correct. Or no, complying at that point. Walking away. The officer is behind Mr. Thompson and Mr. Thompson is walking towards the car as instructed. And then he does, I've watched the video, a relatively slow turn back toward the officer with, I think it's his right hand, sort of not visible, not completely visible. His left hand kind of sweeps around, but not in a I didn't think so. And starts, points in the other direction, not at the officer. And he gets tased with no further warning. Is that right? Well, Your Honor, respectfully, we disagree that there wasn't any aggression present in that movement. Mr. Thompson was turning around to confront the officer. I think any way you characterize that movement, fast, slow, he's certainly not continuing to comply with the lawful order to walk back to the vehicle. You can't tase him, though, just because he doesn't comply with that order, can you? Well, the officer had a safety concern at that point, for him as well as the others. The gentleman is in the street. He's intoxicated. Mr. Thompson's own witness, Mr. Hicks, put forth an affidavit testimony that he informed the officer that Mr. Thompson was intoxicated. So the officer knows he's intoxicated, knows he's walking in the street. And again, there's no dispute that it's a safety concern for all three of them to be back at the vehicle so that the officer can do what he needs to do to finish up the stop. In addition to that, Officer Singleton has testified that, you know, he was confronting me. He interpreted as an aggressive move when he turned around to confront him and to say, hey man, you know what? And that is when the officer pulled the trigger. Thompson didn't step forward, did he? We're talking about kind of a pivoting and a pointing to the back. There wasn't, if I remember the video correctly, there wasn't a step forward. I don't believe the record reflects that there's a step forward. You wouldn't be able to see it on the video because I don't believe you could see their feet. But from the upper body, Mr. Singleton has not been doing as he was ordered to do. The officer wants them there for safety reasons, wants them all there together at the car for safety reasons. And then he turns around and confronts the officer, turns around. And this is where our disagreement is, I think, Judge, that I believe that that's an aggressive move. You know, he could have kept walking and said, hey, you know, officer, my house is right over there. But I think that the turning around and confronting the officer makes it just a little bit different. Other than turning around, what makes it a confrontation? I think it's a confrontation because Mr. Thompson has already exhibited to the officer that he's going to resist the orders, that he's going to be resistant to his authority, that he's not going to obey the directives that he's given him. The officer had told him to stop, show hands, go to my car. He's not doing that. And in turning around and confronting him, I believe that was indicative that he's going to do what he wants to do. But didn't you just said, though, that there was a period of compliance, right? You just said he told him to walk back to the car, show me her hands. And I thought you had just said that that's what he did. Correct, Your Honor. I mean, there was a small period of compliance, but it was very short-lived. And I think that that is further indicative that what little compliance that we got out of Mr. Thompson in him turning around and confronting the officer about essentially wanting to go to his home versus going to the car so that the officer can do what he needed to do. I think that is a confrontation. It's an aggressive move towards the officer and indicative that he's not going to be compliant any longer. He's not compliant in that moment because he talked to me. He was told to go to the car and place his hands on the car and show his hands. I can see I'm at my rebuttal time. Let me ask one question first because you've opened with a clearly established question. What about our 2009 Brown versus City of Golden Valley case? In Brown, I believe that is distinguishable on the facts of this case. More and more, the U.S. Supreme Court has issued opinions discussing the clearly established prong of qualified immunity analysis. They've said that it doesn't have to be exactly on point, but it must be. What are you relying on? Ehlers is years and years after the date you just started by telling us is significant. What was there besides Hickey and Brown before December 12, 2010, that in your view established the district court was wrong on the clearly established element of this? I don't think there was a case that was sufficiently on point to clearly establish that what occurred with respect to the tasing of Mr. Thompson, such that he would have known that it was unconstitutional to do what he did. In relying on Ehlers, my point to the court was that I think that Ehlers is analogous to the events of what occurred December 12, 2010. In Ehlers, I believe the court granted the officer qualified immunity. If that officer is entitled to qualified immunity. I thought you started the right place with clearly established in the issue and then went nowhere with it. Our jurisprudence in the last five years has made tasing kind of a special subset of excessive force jurisprudence, but that didn't exist in December 2010. I don't disagree, Judge Logan. And so we have Brown. We know from Brown it was clearly established that a nonviolent misdemeanant can't be tased or shouldn't be tased. That's excessive force. I suppose this taser was in stun mode? No, it was in dart mode, Your Honor. It was in dart mode. The more injurious. Yes, Your Honor. So what case suggested that to a drunk acting this way could be tased in dart mode? Forget that he fell and unintentionally had a worse injury than would have been anticipated. But just the dart mode tasing, which the Ninth Circuit has had a long opinion about how dangerous this is and ought to be curtailed. Your Honor, I don't think there was a case that said he could, but I think the standard is that there has to be a case that says he cannot act like he did. No, it doesn't have to be on point. I'm sorry? I mean, no, it doesn't have to be on point, but the only thing there was in an Eighth Circuit jurisprudence, I think on this date, was two cases saying, watch out, officers, don't do this when it isn't. I mean, just saying what I'm sure they were trained. Right. And as far as Brown goes, as I said earlier, I think that case is factually distinguishable from this case in Brown. This isn't pepper spray. And this isn't a takedown or an arm bar or anything. This is what was humanely developed to replace shooting. But that means that there's a force continuum that every reasonable police officer understands. And I don't disagree with that, Judge Holigan. I don't know where the clearly established, the Supreme Court's repeated reminders about doing clearly established law carefully. I don't know where that takes me, except I know the district court didn't do it right. Correct. And that is our argument on appeal, that the district court defined clearly established at a high level of generality, and the Supreme Court has . . . Putting Taser and Dartmoor on a force continuum, and with all of the discussion we've had this morning about how marginal the safety risk was, why should we, if we redo the district court's clearly established analysis, why should we come out differently? Well, I think that, Your Honor, it's helpful to look at the alternative. As far as the use of force continuum, we have hands-on force. We have our non-lethal options, hands-on force, pepper spray, and tasing. Those are usually kind of the big three as far as non-lethal force goes. Back in 2010, where tasing fell on that use of force continuum, I don't think that that was clearly established. I've got a single officer in the street with three individuals, one who's walking this way, two who are over here. He wants them all together so that he can be assured of his own safety and that this gentleman is not continuing to walk in the street highly intoxicated. I think the alternative in 2020 hindsight would have been putting his hands on the man, potentially engaging him in physical conflict. And then you've got one officer fighting hands-on with an individual, with two other individuals who can no longer be monitored, watched, who could come to his aid. I think it opens a can of worms. I know it's almost second-guessing, and these are fast-moving situations, but how about a step back and a couple of commands before firing? Well, I think at that point the officer had given his commands and told him to go to the car, show me your hands, put your hands on the car, get over in this area. And there was the brief second of compliance, and then once again, Mr. Thompson is not complying. I'm out of time, Your Honors. I appreciate this opportunity. Mr. Porter? Good morning, Your Honor. How are you doing? Judge Kelly, Judge Loken, and Judge Grunda. May it please the Court, my name is Austin Porter, Jr. I'm here on behalf of Sheldon Thompson. First of all, it is our position that the Court doesn't have jurisdiction to hear this case because of the fact that Jess, as my opposing counsel, has spent all of her time arguing the facts. And the United States Supreme Court in Johnson v. Jones puts the limits on these types of... We have jurisdiction to decide the clearly established issue of law. Yes. But I think this is more of a focus of the facts. Well, she can certainly argue that these facts don't amount to a constitutional violation. Right. What she can't argue is that you need to take the disputed facts in her favor, right? Right, right. Okay. But this is my fourth interlocutory appeal in the last three years, and so here we are again. Basically, Your Honor, what we have here, we have a situation where Mr. Sheldon Thompson was trying to get home on this particular night, which happens to be his birthday, December the 12th of 2010. Mr. Thompson is walking ahead of these two younger guys, and the police officer, in his statement, he said that the reason why he wanted to stop these individuals, because he wanted to determine the age of this young man he saw that he thought was underage as far as being out on curfew. Mr. Thompson, a 57-year-old man at the time, I believe he was 56 or 57, and of course, there was another gentleman, an older gentleman, who was walking along with this young man. So I guess my point is this. If the officer was so concerned about the underage of the youth, when he stopped this underage youth, he could have just allowed Mr. Thompson to go on about his business, go on about his way. But then what happened is, of course, the defendant in this case claimed that Mr. Thompson was walking in the middle of the street. That is not the case. Mr. Thompson was walking on the side of the road. This was a very narrow road. The testimony is going to be that this road is 20 feet, 4 inches wide. And I sent a video to opposing counsel. Your Honor, I apologize. It's not in the records. I thought you lost the arrest issue, at least. That's correct, Your Honor. I did. I lost. But you're arguing that. I lost on the arrest issue. But what I'm saying is, they contend that Mr. Thompson was walking in the middle of the road. And Mr. Thompson said, no, he was not. As well as the other witness, Mr. Hicks, said that Mr. Thompson was not walking in the middle of the road. And so you have a situation where the officer gets out of the vehicle, does a semicircle around. And, of course, the law is very clear at that time. Brown v. The City of Golden Valley, a 2009 8th Circuit decision, saying you cannot tase someone just because they are not doing what you're asking them to do. And Brown, Mrs. Brown, was on the cell phone because she was very disturbed about what she had seen the officer do to her husband. The officer were upset over the fact. We know Brown. OK. I mean, it's cited all the time. Right. But it is the worst excess use of a taser imaginable. And this case is, too, Your Honor. Every case, including this one, is at least somewhat distinguishable from Brown. Well, as far as this case, Your Honor, I would argue that this case is really a more egregious use. If there was a legitimate, a reasonable perception of a safety issue, this is not Brown. Well, Your Honor, the officer owns statement to his partner. When the partner walks up and says, why did you tase him? What happened? He said, I tased the guy simply because he was refusing to do what I told him to do, which was walk back to the car. Now, Mr. Thompson was, in fact, walking back to the car. He turned around. Is that in the summary judgment record? Yes, Your Honor. I mean, it's in the summary judgment record that Mr. Thompson, basically what the facts were, the officer told Mr. Thompson to show his hand, and he did. Stuck his hand out. You saw that on the taser. The first, show me your hand, show me your hand. That's what the officer said. First, the officer said, stop. Mr. Thompson, stop. Show me your hands. Mr. Thompson had his hands out. And then he said, turn around, walk back to my car. So Mr. Thompson turns around. He's walking back. He takes five, six steps. And then he slowly turns around. He's trying to tell the officer, man, that's my house just right over there. And before he can get that out, the officer tased him without any warning whatsoever. And of course, Mr. Thompson followed, hits his head, and suffered a severe brain injury as a result of what happened. And I asked Mr., the officer, Officer Singleton, why did you tase this man? And he said that, according, in his testimony, he said that he tased him because he was not doing what the officer told him to do. And I asked him, what was that? Walking back to his car. I said, well, he was walking back, except that brief moment. And he said, and Officer Singleton said that when Mr. Thompson stopped for a brief period of time and turned around, and that's when Singleton said he was no longer obeying his order. Well, you can't tase someone in a situation like that just because someone has briefly stopped doing what you told them to do. And that's just totally unreasonable. And that's what the court, the side of the trial court, said. Based on the totality of the circumstance, it was totally unreasonable. A jury could find that it was just totally unreasonable for the officer to use force in that situation. And Bauer versus Norris, Norris was a case that had been decided sometime before this incident, saying that when you have a person who is a misdemeanor, and at the time that the officer stopped my client, he did not have any idea that Mr. Thompson was intoxicated. He had no knowledge. His thing was he wanted to stop these three individuals who were walking in this area because he felt that this young man was underage. You said that the officer testified that he tased because Mr. Thompson just stopped doing what he told him to do. Yes. Is there anything else in the testimony that he gives for why he did that? Is that the single reason? Your Honor, that's what he told his partner. When the partner walked up on the scene, he told us, you can hear on the tape, the officer said, I tased him because he stopped doing what I told him to do. I understood you to be saying that it was also in his testimony. Yes, I took his deposition. I took his testimony, Your Honor, and I believe it's- But didn't he also testify about safety concerns and not knowing where his right hand was and that sort of thing? Your Honor, the officer claims that Mr. Thompson's right hand was in his pocket, which is not the case. Mr. Thompson's hand was down to his side. At no time when Mr. Thompson was walking toward the officer's car, as he had been told to do, and it was cold and Mr. Thompson had a coat on, he just kind of threw his hand behind his back like this, walking. I appreciate all that, but that's not really the question. The question is, did the officer testify about having some safety concerns? Your Honor, I think the officer's safety concern was he wanted all three people back at the car at the same time, because Mr. Thompson was about four or five feet ahead of the other two gentlemen who were behind him. And so he said that in order to ascertain whether or not this young man was out on curfew, he wanted to get them all back together at the car. Let me see if I can get a little more clear. You said that the officer testified that he tased him because he wasn't following instructions. Yes. And I think the question is, did he also testify at all about any safety concerns, and more specifically, as your client turned around and faced him? He wrote in his police report that my client turned around in an aggressive manner, which the videotape disputes that. The videotape does not support that. And the officer, after the officer got back to the police station and drafted up his narrative, he put in his report that he felt threatened. Well, there was no reason for that, and you can clearly see on the videotape that Mr. Thompson is turning around, as Judge Kelly mentioned. It was a slow manner. I think you also mentioned, Judge Grunder, that it was a slow manner in which he was turning around, and he wasn't pointing at the officer with his left hand. He was pointing at his house, trying to tell his officer that his house was just right over there. At the time, the officer stopped, and Mr. Thompson was only about three feet from his yard, and there was nothing that the officer should have felt threatened about whatsoever. Now, there's a dispute. The officer claimed that my client had his hand in his right pocket. The officer at no time ever told Mr. Thompson to take his hands out of his pocket. We don't believe that his hand was in his pocket because the videotape showed that he put his hand behind it. I think the testimony is pretty clear that he did at least one time say, show me your hands. Right. And when he said, show me your hands, he stuck his hands out. Right. And then he said- The officer says that means you should keep them out. I don't know if your client should have known that or not, but- Right. He said, show me your hands. He stuck his hands out. And then he said, turn around, walk back to my car. And that's what my client did. He turned around, walked back to his car, took five, six steps. And the officer could have told him, look, take your hands out of your pocket. He never did that. There was at least five or six seconds where he turned around and started walking back to his car until the time he was tased. And when Mr. Thompson began to turn around and try to explain to him where his house was. And I asked Mr. Singleton about why did he tase him. And in his deposition testimony, he testified that the reason why he tased him was because Mr. Thompson had stopped for a brief period of walking back to his car. In other words, he felt that Mr. Thompson was not complying with the order of walking back to his car because he simply turned around at that point and tried to communicate something to Mr. Singleton at that point in time. And that's in the testimony that we have. Does the record reflect whether Singleton was told before the tasing by the youngsters that we were just making sure the old guy got home safely? Yes, Your Honor. That's what happened was these Mr. Thompson nephew, Mr. Hicks and his other gentlemen saw they were in Mr. Thompson's yard and they saw Mr. Thompson walking up.  Did they tell Singleton that before the tasing? It's possible that they told him that. I can't remember that particular point. That may not be in the record. Right. It was my understanding, Your Honor. It was my understanding. And I think there was an affidavit to that effect. I think they told him that after Mr. Thompson had been tased. But according to, I believe, Mr. Hicks' testimony, when the officer pulled up, he told him to stop. That's all he did. He said stop. And the two young men stopped. And, of course, Mr. Thompson continued walking. And so I believe the testimony from Mr. Hicks was after the tasing happened, that's when he was explaining to the officer what they were trying to do, that they were trying to walk their uncle home. And I believe that's what the testimony is. I have a question about the clearly established issue. How much was that discussed at the district court? It doesn't seem to be addressed in great deal in the district court's opinion or in the briefing below at the district court. Was that argued strenuously in front of the district court? Tell me how that played out. I believe it was argued as far as in my brief is concerned, because obviously I cited Golden City versus Golden Valley. And I cited Bower versus Norris. I cited that the case law had been clearly established, that certainly you just cannot tase someone just because someone is not fully compliant with a particular order. So that was thoroughly addressed by the parties at the district court in your view? I believe it was, Your Honor. And I believe that I addressed it pretty thoroughly in my brief as well. So, yes, I think it was established at that point. Your Honor, this is a case where I believe it's just extremely, this is an outrage, egregious use of tase, excessive use of force in this particular case. Here you have a gentleman that he's walking home, trying to get home, and he simply turns around to try to address the officer. And rather than the officer warn this guy, tell him to stop what he's doing, the officer tase him. And there was no excuse for that. And the officer is clearly heard on tape. He didn't mention to his partner that he felt threatened. He didn't mention to his partner that the guy had his hands in his pocket. The videotape really tells the whole story. Now, he wanted to try to go back to and try to doctrine up and put in his report that he felt threatened and all that. And also, the incident happened right in front of my client's house, 1035 North Cooper. That's where the incident is on the incident report. It reflects where it happened. And my client is right there at his house. And so, Officer Singleton, from his own words, tell his partner that he tased my client because he stopped doing what he told him to do. And that you cannot do. And that's what the law, Brown versus City of Golden Valley, clearly had that established at the time. The woman refused to get off the cell phone. The officer tased her. Oh, you can't do that. And you can't do it in this situation. We ask that you affirm the lower court decision. Thank you for your time. Thank you. Ms. LaFever, do you have any time? No, Your Honor. I think we understand the issue. And it's been well briefed and argued. We take it under advisement. Thank you, Your Honor.